## BULLION MINING COMPANY, RESPONDENT, *v.* THE CRŒSUS GOLD AND SILVER MINING COMPANY, APPELLANT.

If a plaintiff, pending a suit in ejectment against several defendants, each in possession of distinct parts of the property sued for, sells out to one of the defendants, the controversy as to that defendant is ended, and he may under his purchase prosecute the same suit against the other defendants for such portion of the property as they hold.

Bullion Mining Company *v.* The Crœsus G. and S. Mining Company.

In such case the purchaser, being substituted as plaintiff, cannot amend his complaint so as to include other property claimed by himself under a different title.

When an action has been brought in due time for one piece or portion of property, it would be bad practice to allow the complaint to be so amended as to include another piece of property which would otherwise be protected from recovery by the Statute of Limitations, and thus embarrass the defense under that statute.

When an undivided portion of a tract of land is recovered, the Sheriff would not be justified in entirely expelling the tenants who are in possession, if they make no opposition to a joint or common possession by those recovering the judgment.

All tenants in common, under our statute, may unite in prosecuting an action for possession of the common property. So one tenant in common may sue for his share. But whether more than one and less than all may sustain such an action : Query.

When a suit is brought for a blind ledge or lode bounded by walls found at the depth of two hundred feet below the surface, the ledge only and no part of the surface can be recovered.

When a miner locates a portion of the surface, and also a lode or ledge following its dips, angles, and spurs, he may have his Common Law judgment for the surface, and also a judgment following the lode under other public lands.

When a ledge located as such comes to the surface, the locator may recover the surface, provided the outline of the ledge is visible on the surface.

The common law doctrine, that he who possesses the surface of the earth owns all to the center of earth, is greatly modified as to the rights of miners and others on the public lands. One may be entitled to the occupancy of the surface, another to the veins of mineral running under the same land.

The Sheriff has no authority to put a party in possession of land not described in complaint or judgment.

The fact that plaintiff recovered a vein or lead gives it no right to hoisting works erected for the purpose of taking ore from that vein, unless it also had recovered the surface on which the hoisting works were erected.

APPEAL from a judgment rendered in the District Court of the First Judicial District, Storey County, the Hon. RICHARD RISING presiding.

*Charles E. DeLong,* for Appellant, made the following points :

The demurrer should have been sustained to the original action, because it was brought by a part only of the tenants in common. (See *Johnson et al.* v. *Supelveda,* 5 Cal. 149.)

The extraordinary latitude allowed in amending this complaint— in allowing a defendant to be substituted for the plaintiff, in allowing the amount of property sued for to be increased in the amended

complaint, the description of property altered, etc.—is entirely without precedent, and erroneous.    More especially was it erroneous as to this appellant, who had no notice until after the amendments were made.

By the action of the Court, appellant was deprived of proper time to answer—deprived of the defense arising upon the Statute of Limitations as to seven hundred and fifty feet of ground—and deprived of the defense arising from the fact that part only of the tenants in common had sued.

As to power of Courts to allow amendments, see *Davis* v. *Mayor of the City of New York*, 4 Kernan, 526 ; and *Wright* v. *Straus*, 3d Code Reports, 138, 3d Duer, 647, and. 4 Johnson, 483.

The judgment being merely for the ledge or vein, the Sheriff could not deliver possession of land and houses not described in the complaint or judgment.

*Williams & Bixler*, for Respondents, made the following points :

Although the suit was originally brought by tenants in common only representing 875 feet out of 1,600 feet, still they were entitled to recover the whole 1600 feet as against appellant, a mere trespasser. (See *Collier* v. *Corbett*, 15 Cal. 183 ; *Knox* v. *Marshall*, 19 Cal. 617 ; *Touchard* v. *Crow*, 20 Cal. 150 ; *Clark* v. *Huler*, 20 Cal. 196 ; *Hart* v. *Robertson*, 21 Cal. 346 ; *Rowe* v. *Bacigalupi*, 21 Cal. 633 ; *Maloney* v. *Van Winkle*, ib. 583.

There was no demurrer for *nonjoinder of parties.*

The demurrer was waived by answering to the merits.

The action was properly brought by tenants in common.    Such tenants may unite in an action for recovery of real estate (*Alford* v. *Dewin*, 1st Nev. 207.)

The substitution of the Bullion Company as plaintiff was properly made under the provisions of Section 16 of the Practice Act.

This substitution could not deprive the defendant of the right to plead the Statute of Limitations.

The hoisting works were within the vein walls, and therefore recovered and embraced within the judgment for the vein or lode.

The works were erected on vein matter, immediately over the compact ledge, and erected for the express purpose of hoisting the

ores from the ledge, and connected with the ledge by a perpendicular shaft.

These works were appurtenant to the vein, and a part of the realty as such. (See *Merritt* v. *Judd*, 14 Cal. 59.)

Opinion by BEATTY, J., full Bench concurring.

On the 20th of November, 1863, Theodore Winters and some seven others, plaintiffs, filed a complaint against the Fairview Mining Company, the Crœsus Mining Company, the Bullion Mining Company, the Minerva Mining Company, the Superior Mining Company, the Alpha Mining Company, and The Four-Twenty Mining Company, seeking to recover an interest in a certain mining claim, consisting' of an " equal undivided eight hundred and seventy-five feet" in a claim described as " The Cosser & Co.'s claim."   *     * " Beginning on that certain gold and silver bearing quartz ledge in said district called the Comstock ledge, at the southern boundary of the claim formerly called the Webb and Kirby, and now known as the Chollar claim, and extending thence south along and following said Comstock ledge, with all its dips, spurs, and angles, a distance· of 1,600 feet,   *     * and extending on each side of said ledge 100· feet."

The present appellant first demurred to this complaint, and, on the demurrer being overruled, answered, and then, by leave of the Court, put in a supplementary answer by way of amendment to the original answer.

Most, if not all, the other companies sued have put in some defense, but their answers are not material, as it regards the determination of the points before us.

No action is shown by the record to have been taken in the case after the answers filed, until the evening of the 12th of May, 1865, when a part of the defendants were served with notice, affidavit, copy of amended complaint, etc.

The notice was to the effect that the plaintiffs, next morning at ten o'clock, would move the Court to dismiss the complaint as to the defendant, the Bullion Company, make an order allowing the Bullion Company to be substituted as plaintiff, and also allowing an amended complaint to be filed by the Bullion Company.

At ten o'clock, those defendants who had been served with notice

came into Court and protested against the hearing, on the ground that the notice was insufficient, and appealed to a rule of the Court requiring five days' notice of motions of this character.

The Judge observed from the bench he would shorten the notice, and ordered the motion to be heard at two o'clock that day. At two o'clock the motion was heard and sustained.

After the order was made as above stated, a notice was then served on the present appellant that the Court would be asked to make the orders, which, in fact, had already been made. The bill of exceptions says this notice was served on the appellant on the afternoon of the 16th of May. This date is evidently a mistake, because it is inconsistent with other statements in the same bill of exceptions.

It must have been served on the appellant after the 13th and before the 16th; probably on the afternoon of the 15th. At the opening of the Court on the 16th the motion was called up and sustained. This was in effect only ordering that the appellant should be bound by the order which had already been made upon notice to other defendants.

The appellant protested against the whole proceeding as irregular, and calculated to deprive it of a fair opportunity of defending its rights in the case, and excepted to the ruling of the Court.

The Court ordered appellant to file its answer to amended complaint the next morning, (the 17th of May) although they had never been served with copy thereof. On that morning the answer was filed, and the trial of the cause proceeded.

The amended complaint is not for an undivided interest of 875 out of 1,600 feet, but for the entire claim known as the " Cosser claim," more particularly described as follows : " Sixteen hundred feet in length upon that certain quartz lode known as the Comstock lode, being the section of said lode bounded on the north by the claim of the Chollar Silver Mining Company, and extending southerly along said lode, and including all the dips, spurs, and angles thereof, a distance of 1,600 feet of the said lode, being bounded upon the west by a wall of dark green rock, which appears in the working shaft of the Bullion Mining Company, at a depth of about 460 feet, and in the working shaft of the Chollar Company at a depth of about 425 feet, having a dip to the east of from thirty to

fifty degrees, and running in a general north and south course, and bounded upon the east by a heavy seam of clay selvage which appears at the lower works of the said companies, and lies along the country rock which forms the eastern wall of said lode."

The case went to trial on this amended complaint. The jury found for plaintiff, and judgment was rendered for restitution of the property as described in this amended complaint. After judgment an execution was issued, and the Sheriff put plaintiff in possession of certain hoisting works of the appellant. The appellant contending that the judgment did not embrace these hoisting works, moved the Court for an order to reinstate it in possession of said works. This the Court refused. Appellant appeals from the judgment and also from the order refusing to reinstate it in possession of the hoisting works.

We think both appeals must be sustained. The original complaint was for only 875 out of 1,600 feet, or for an undivided inter est of thirty-five sixty-fourths of the whole. This is all the original plaintiffs claimed.

If these plaintiffs sold out to the Bullion Company, doubtless it would have been proper to substitute that company as plaintiff, and allow it to conduct the suit in its own way. We do not see that the fact that the Bullion Company had originally been a defendant could make any difference. Here was a suit for mining ground which seems to have extended over the claims of several companies. If one of these companies, sooner than litigate the suit, chooses to buy plaintiff's claim, it had a right to do so. When that was done, the controversy was settled as to those parties. But in such a case it would not be improper to allow the suit to continue as to the other defendants. But if continued, it must be the same suit, and not a new one. It must be for the property claimed by the original plaintiffs, and not for that property and other property claimed by the new plaintiff, united by a new declaration to that which was originally sued for.

If A were to sue B for a horse, and then assign the cause of action to C, C could not amend his complaint and charge that B had taken the horse from A, his assignor, and taken a yoke of oxen from C, the present plaintiff. Every one would at once see that this was uniting a new and distinct cause of action, arising to C

alone, with the original cause of action which arose to A. To allow this jumbling together of new and distinct causes of action, originally pertaining to different parties, would lead to much confusion and to no good. We have seen no precedent for such a practice, and cannot believe it justifiable. In this particular case, the reasons for refusing to sustain such a course are still stronger than in the case supposed.

A Statute of Limitations was passed in the latter part of November, 1861, to take effect December 2d, 1861, which limited all actions for the recovery of mining claims to two years after cause of action arose, but said statute not to begin to run against causes of action already existing until after its passage. When the first suit was brought, the statute had not run in any case, and could not be pleaded. This thirty-five sixty-fourths of the 1,600 feet was by the bringing of this suit protected from the running of the statute. But in a few days after the bringing of this suit, the right to sue for the remaining twenty-nine sixty-fourths of this claim may have been barred by the Statute of Limitations.

The appellant claims that such was the case. It certainly had the legal right to try to establish such a defense. It was not good practice to thus mix up two causes of action so as prevent or embarrass such a defense. We mention this as an illustration of one of the many evils resulting from such a practice. If such a practice were allowed, all a plaintiff, who finds himself about to be defeated, has to do to throw the costs on a defendant, is to assign his cause of action to some one who has a good cause of action against the defendant, and let the new party be substituted and unite a new cause of action, which he can sustain, to the old one, which cannot be supported, and thus mulct the defendant in all the costs. Such a practice is without precedent, unjust, and not to be tolerated.

No doubt when a new plaintiff is substituted, he may, like any other plaintiff, amend his complaint, in a proper case, as to mere matter of form, provided it is substantially the same cause of action as that originally set out. The respondent claims that such was the case here ; that, although the original complaint was only for an undivided interest of 875 out of 1,600 feet, still, if a judgment had been had under that complaint, the plaintiffs would have been

entitled to possession of the whole 1,600 against the appellant, a mere trespasser.

Upon this point respondent cites several California cases.  Some of those cases establish this proposition, that where a plaintiff sues for a tract of land, claiming that he is entitled to the sole possession thereof, and shows on the trial that he is a tenant in common with others in the land, and that he and his cotenants are entitled to the exclusive possession of the property described, he will be entitled to recover the entire tract against trespassers who hold adversely to him and his cotenants.   These California cases all seem to be based on the authority of a case in Day's Reports, to which we have no access.   Whether they are sound or not, (of which, possibly, there is some doubt) we have not thought it necessary to inquire.   That is not this case.   Here the whole possession was *not* sued for.   The judgment could be for no more than was claimed.   If the plaintiffs had obtained judgment for thirty-five sixty-fourths, we know of no law which would have justified the Sheriff in entirely expelling defendants from possession if they had quietly submitted to a common or joint occupancy by the plaintiff with themselves.   We have certainly been referred to no authority on this point, and with our present light must hold such a recovery would only have entitled plaintiff to a common possession with defendants, and those owning the other twenty-nine sixty-fourths might become barred before the trial of the first suit.

For these reasons, we think the amendment should not have been allowed, and that the judgment rendered on that amended complaint is erroneous and must be set aside.   If the Bullion Company can recover anything in this case, it can only be the thirty-five sixty-fourths sued for in the original action.   This Court has ruled that *all* the tenants in common of an estate may unite in one action under our statute for the possession of the common property.   It is not disputed one tenant in common may sue for his undivided fraction. But this Court has never decided, as counsel for respondent seem to think, that more than one and less than all the tenants in common of a piece of land may unite in such action.

This point being one of much difficulty and doubt, we have not thought it necessary to decide, as this case must be reversed on other grounds.   In this case the appellants complain, and we think

not without just ground, of precipitancy and haste in making the order for change of parties, time for filing answer, etc. But, as the judgment is reversed on other grounds, it does not seem necessary to decide whether this undue haste and compulsion on the part of defendants to answer a new complaint, without time for reflection or consideration, would of itself have been sufficient to set aside the judgment.

The action of the Sheriff in putting the plaintiff in possession of the appellant's hoisting works, was a clear and unmistakable trespass. The complaint on which the suit was tried describes nothing on the surface. It describes a *lode* (a Cornish word nearly synonymous with vein) bounded by certain rocks which are found, if we may believe the complaint, only at the depth of several hundred feet below the surface. When found at that depth, they are pitching, says the complaint, to the east at an angle of thirty to fifty degrees. Now, if these rocks are the boundaries of the claim sued for, and the rocks come no nearer the surface than two or three hundred feet, then the vein comes no nearer than two or three hundred feet. For the vein or lode is the matter contained between those two walls; where the walls terminate, there the veins terminate—unless there should be a solid ledge arising from the vein, which supports itself without walls. But counsel for respondent seems to think that in an ejectment plaintiff must recover from the surface of the earth downwards. They seem to think it would be impossible to recover a vein without recovering the surface over the vein. At common law the recovery in actions of ejectment and all real actions, was usually for a portion of the earth's body or substance, somewhat in the form of an inverted cone or pyramid; the surface of the earth recovered being the base of the figure, and the apex at the center of the earth. But the judgment rendered for a ledge, lode, or vein is quite different. It may include a portion of the earth's surface, where that surface has been properly located.

The plaintiff would, in case of a surface location, together with the lode following its dips, spurs, and angles, then be entitled to his pyramid carved out of the earth's body, having its base on the surface and its apex at the center of the earth. But if the lode dipped out of this pyramid, as they nearly always do, he could also have his judgment following this lode (usually in the form of a solid

Bullion Mining Company *v.* The Crœsus G. and S. Mining Company.

parallelogram) wheresoever it might go—at least as far as it might extend under the public lands.   But if a party locates a ledge without any location on the surface, he can only recover the ledge.

If the ledge comes to the surface, as is frequently the case, undoubtedly he is entitled to the surface.   But that could only be where the outlines of the ledge are visible on the surface.

It will probably be suggested that if a party locating a ledge does not get any of the surface, he cannot get to his ledge, and the location will be valueless.   This, we think, is rather an imaginary than a real difficulty.   Nearly all ledges diverge more or less from the perpendicular.   The owner has the opportunity of working them from a great many different points.   There would generally be no difficulty in finding some accessible point from which the vein might be reached that is not occupied.   If all such points are occupied, then he must, like anybody else, buy what he wants.

If we were to hold that a party locating a blind ledge (one which does not show itself on the surface) must have a certain portion of the surface to work his ledge, where are we to give it to him?   Nearly all ledges diverge more or less from the perpendicular.   Frequently neither a ledge nor the wall rock inclosing veins or lodes reaches to the surface by many feet—sometimes by many hundred feet.   Now, if we are to extend such veins to the surface, where no particular surface ground has been located, what rule are we to follow?

If the walls are first found at a depth of two hundred feet below the surface, and at that depth have a dip of forty-five degrees, shall we ascend from the top of the wall rock by perpendicular lines to the surface, and give the ground included between those lines thus produced to the holder of the ledge, or are we to extend imaginary lines from the top of the wall rock to the surface at an angle of forty-five degrees, and give to the ledge-holder the ground between those two lines?   It is evident there would be a difference of two hundred feet in the location of the two pieces of ground.   To adopt either rule would be to endanger the improvements of others who might erect buildings in ignorance of the true location of the ledge.   Sometimes ledges change their dip.   At one time they may lie nearly flat, at another they may be nearly perpendicular.   Sometimes the same ledge, as is claimed in this place, may dip to the west; then, at a certain depth, change and dip to the east.   It

would be impossible to adopt any sensible and practicable rule for extending to the surface the location of ledges or lodes that are located merely by name as extensions of known or marked ledges, where those locations show no croppings or indications on the surface. It is as necessary in every mining locality to have houses for boarding in, mechanics' and traders' shops, etc., as it is to have mines. They are as worthy of protection as the mines themselves. We cannot adopt any rule that will sacrifice the houses and shops of one class of citizens, to promote the interest of another.

Whilst we depart from the rules of the common law so far as to let the miner follow his lode of quartz wheresoever it may go, even though it runs under public land which was in the occupancy of another before the mine was located ; on the other hand, the occupier of the surface is equally entitled to protection in the use of that surface, if a miner having a senior location should in the course of time be found to run under his improvements. The doctrine of the common law, that he who has a right to the surface of any portion of the earth, has also the right to all beneath and above that surface, has but a limited application to the rights of miners and others using the public lands of this State. Necessity has compelled a great modification of that doctrine. The departure from those old and established doctrines of the law will, doubtless, lead to many complications. To adhere to the common law rules on this subject is simply impossible. To attempt to carry out common law doctrines on this point would either give all the houses in Virginia to the mining corporations, or else all the most valuable mines to those occupying the houses. The well established custom of miners to locate veins of mineral, claiming to follow them with all their dips, spurs, and angles, without reference to the occupancy of the surface, has compelled a departure from common law rules.

In this particular case, a shaft sunk in the hoisting works, which are the subject of controversy, penetrates the eastern wall rock, passes through it, and reaches the vein at the depth of about two hundred and fifty to two hundred and fifty-five feet. At this point the vein is dipping to the east at an angle of forty-five degrees. The eastern wall rock is, of course, pointing toward a spot on the surface (supposing the ground to be level) some two hundred and fifty feet west of the disputed property. Consequently, if the wall were

continued, the most easterly portion of the vein would be over two hundred feet west of the hoisting works. If the eastern wall breaks off at any point above or west of where the shaft is sunk, whether a shorter or longer distance, the hoisting works are still in any event east of that portion of the land lying perpendicularly over the vein where it comes nearest the surface.

· But, say respondents, the vein, where it gets to within two hundred feet of the surface, changes and has a downward dip to the west, instead of to the east, as it does at a depth of two hundred and fifty feet. That seems to be the general theory among miners in regard to the Comstock lode. But there is no evidence that such is the case at this particular point of the vein. There is no evidence here of wall rocks approaching the surface nearer than two hundred and fifty feet of the surface. The only croppings of the ledge spoken of in the testimony are eight hundred feet from the hoisting works.

The surface of the ground on which these works are situated is not described in the complaint, the judgment, or execution.

The Sheriff had no right to meddle with these works, because the plaintiff's lawyers, witnesses, or somebody else supposed that if certain wall rocks run where, according to their theory, they ought to run, this piece of land would be within those walls.

Respondent makes an argument to prove that hoisting works are a part of the freehold on which they stand ; that these hoisting works were erected especially to work this mine or lode, and therefore appurtenant to the mine, and must go with it. That the hoisting works belong to the realty, and must go with the land on which they stand, we certainly believe to be a correct proposition. If the plaintiff was entitled to recover the land on which they stand, then it was entitled to have the works. If it could not recover the land, it could not recover the works. How the intention with which the works were erected could influence the plaintiff's right to recover the land on which they stand, we are at a loss to comprehend.

· If plaintiff is entitled to recover these hoisting works because they were erected to hoist ores from this mine, it would, upon the same principle, be entitled to recover an assay office in Virginia City, or any other place in Storey County, if one was erected there to assay ore from this mine. The object for which the works were erected

has nothing to do with the question as to who is entitled to the ground on which they stand.

The judgment of the Court below must be reversed. The plaintiff will be allowed either to dismiss its action, or to move the Court to reinstate the pleadings as they stood before the order was made allowing the amended complaint to be filed.

The Court will also make an order directing the Sheriff to reinstate the appellant in possession of the hoisting works from which it was ejected.

---

### RESPONSE TO PETITION FOR RE-HEARING.

A tenant in common suing for only a part interest in the property cannot recover judgment for the whole.

This Court will not sanction a practice which is unprecedented and calculated to produce complication, and result in injustice, merely because it may be shown that the counsel of complaining party might, by the exercise of great astuteness and readiness, have guarded against the threatened injury.

The fact that hoisting works are erected by a trespasser over a vein of ore, and for the purpose of hoisting that ore, does not give the owner of the vein any right to those works, unless he also is owner, or is entitled to the possession of the very soil on which these works are erected.

Opinion by BEATTY, J., LEWIS C. J., concurring.

Response to petition for re-hearing.

The first point made by respondents in their petition for re-hearing is, that this Court erred in supposing that the original suit was only for eight hundred and seventy-five feet of ground and not for 1,600 feet. After a careful examination of the original complaint, it still seems apparent to us the suit was for only eight hundred and seventy-five feet.

The complaint avers substantially that plaintiffs and their predecessors were in 1859 the owners of, and in the possession of eight hundred and seventy-five feet, undivided interest in a certain mining claim called the Cosser claim, which claim is more particularly described (here follows the description of a claim of 1,600 feet). That subsequently defendants entered on said claim and ousted plaintiffs therefrom, and then winds up with a prayer for the possession of the "mining grounds aforesaid."

The " mining grounds aforesaid " might mean those of which plaintiffs had been in possession, to wit: eight hundred and seventy-five feet, or it might mean the whole 1,600 feet.   But the gist of the complaint, the very wrong complained of, is that the defendants ousted plaintiffs ; ousted of what ?   Why, doubtless, of eight hundred and seventy-five feet, in possession of which the plaintiffs had been.

There is no allegation in the complaint that plaintiffs were ever in possession of more than eight hundred and seventy-five feet, or that they ever had the right of possession to more.

One tenant in common may be in possession of the entire common property.

If in such case he be ousted by a trespasser who is a stranger to the title, we see no reason why, upon a proper complaint, he may not recover the entire premises from the trespasser.

But if he wishes to recover the whole, he must allege his possession of the whole and ouster therefrom ; or other facts clearly showing his intention to sue for the whole, and his right to such recovery.

Here there was nothing of the kind, and under the original complaint no recovery exceeding eight hundred and seventy-five feet could have been had.

Then, to amend the complaint so as to seek to recover 1,600 feet, was so to amend it as to introduce a new cause of action.

But, argues respondent, even if it was introducing a new element into the suit, and the Court below erred in so allowing, this error should be disregarded unless it produced, or reasonably might have produced, some detriment to the other side.   And in connection with this proposition, petitioner asserts two secondary propositions : first, that if the action as to seven hundred and twenty-five feet was barred by the Statute of Limitations, that statute could have been pleaded to this part of the action embracing the seven hundred and twenty-five feet as readily as if there had been a separate action therefor ; and secondly, that no such plea could have been successfully introduced in this case, even if a separate action had been brought for the seven hundred and twenty-five feet.

To the first of these secondary propositions, we say the law may be as stated by counsel.   Possibly, if defendants had been allowed

time, their counsel might have found an authority for interposing the plea of the Statute of Limitations as to seven hundred and twenty-five feet. Yet it must be admitted that it is a complicated and not well settled question. The circumstances of this case, as far as shown in the record, indicate that if a separate action for the seven hundred and twenty-five feet had been brought, that plea might have been successfully interposed. Hurried as counsel for defendants were in this case into their defense, they failed to interpose that plea, and a recovery is had against them, which probably never could have been had under more regular proceedings.

This Court cannot sanction such irregular, unprecedented and dangerous practices merely because there is a possibility that counsel on the other side may by great astuteness and readiness be able to ward off threatened dangers. The proceedings in Courts of justice should be as much simplified and as little complicated as possible. Such a practice as was indulged in in this case must inevitably lead to confusion, complication, uncertainty and injustice.

As to the other proposition, that the Statute of Limitations could not have been successfully interposed in this case, we confess that we are totally at a loss to comprehend the reasoning of the counsel.

Counsel state that the original plaintiffs, Winters and others, claimed under the Cosser title ; that the defendants claimed under the Buchanan & Smith location. That the possession of one tenant in common inures to the benefit of all his cotenants, etc., and asks : " If Winters and others were in the actual possession in the proportion of eight hundred and seventy-five to 1,600 undivided of each and every inch of the ground, how is it possible for the Crœsus Company to have been at the same time in the actual peaceable possession of any part of it under an adverse title ?"    *    *

" If Winters and associates were in possession as alleged, and as found by the jury, of the premises in dispute, that possession was good for the other owners—unless adverse to them, of which there is no pretense—and would inure to their benefit. As long as Winters and associates so remained in possession there could be no ground for a plea of the statute by the defendant against their cotenants."

From this language one would suppose that Winters and other plaintiffs had always been in possession of eight hundred and seventy-five feet of the ground sued for.

But the plaintiffs' complaint only avers that they were in possession in June, 1859, and remained in possession until ousted by plaintiff on the —— day of ——, 1863. The amended complaint was filed in May, 1865.

Now, if the ouster took place in the early part of May, 1863, or prior to that time, then Winters and his coplaintiffs had not been in possession of the eight hundred and seventy-five feet for more than two years, and there was no reason why the statute should not have run against the seven hundred and twenty-five feet.

Taking the original complaint as literally true, it does not negative the idea that the ouster was prior to May, 1863. But it is not unusual for lawyers to allege the ouster to have taken place just before the suit is brought, although, in fact, it may have been several years previous.

Whilst we have nothing positive in the record showing when the ouster did take place, if indeed there ever was an ouster, the facts that much work had been done and valuable improvements put on defendants' claim would indicate that the ouster, if any, took place several years prior to November, 1863, when the original suit was brought. Certainly, the finding of the jury did not prove that Winters and his coplaintiffs were in possession of eight hundred and seventy-five feet when they brought their action. If they were, we don't comprehend why they brought suit.

The next point which the petitioners seek to have reviewed is our decision as to the hoisting works. Petitioners urge that the hoisting works were between the walls of the vein, and attempt to show it in this way. They say the shaft connected with the hoisting works is entirely in *vein matter* from the top down, as shown by Mason, a witness for the defendants, and then put their argument in this form:

" Every vein must necessarily have, and has, two walls, and all matter embraced within those walls and denominated ' vein matter,' is a part of the vein. The hoisting house and machinery was upon, and the entire shaft in, vein matter. Therefore they were between the walls of the vein or ledge."

By the same process of reasoning, it may be proved that a man is a horse. Every man is an animal, and every horse is an animal: therefore every man is a horse.

Admitting that every vein has outside walls, and all matter between those walls is vein matter, it certainly does not prove that all *vein matter* is contained between two walls. Vein matter may certainly be removed from between its original walls either by artificial or natural means, and after such removal, it does not cease to be vein matter. When we say that certain substances are vein matter, we may mean that those substances are now a component part of some mineral vein, or that at some past time they did constitute a part of the substance of some vein. It is well known that what miners call *vein* matter frequently rolls down a mountain side to a great distance from its original location in the vein. By the action of water it is carried to still greater distances. The hoisting works in this case were on the side of a mountain.

They may have been on vein matter which had rolled down the mountain for an indefinite distance. There is certainly no satisfactory evidence to show those works were within the walls of the ledge sued for, and, therefore, the Sheriff, under a judgment for a quartz ledge, had no right to interfere with those works.

The fact that the original complaint sues for the ledge and two hundred feet on each side of it can make no difference. The case was not tried on that complaint; therefore, the first complaint has nothing to do with the question. This Court only decided the Sheriff had no right under that particular judgment to interfere with defendants' hoisting works. It did not decide what would be the effect of a judgment for the lode and two hundred feet on each side thereof. That is a question not now before us.

Petitioners again go into a long argument to show that the use to which a thing is put may determine whether it is or not a fixture.

Admitting the proposition to be true, we do not see its applicability to this case. A large building erected on the soil with steam engine, etc., for hoisting ores we fully admit to be a fixture. But a fixture to what? To the soil on which it stands. The difficulty with plaintiffs here is, not that they failed to show that such a building was a fixture, (we are not aware that any one disputes that) but they failed to show any right of possession to the soil on which the build-

ing stands. If plaintiffs were entitled to the soil on which this building stands, they would have been entitled to the building if it had been erected to grind corn.

If they were not entitled to recover the soil, they could not recover the house standing thereon, although it was erected for the purpose (unlawful, perhaps, if you will) of taking ore from plaintiffs' mine. The purpose for which a house is erected cannot change its locality. Nor can we see how, that purpose is to affect in any way the rights of plaintiffs to recover the ground on which it stands.

The petition for re-hearing is denied.